I respectfully dissent from the Opinion and Award of the majority because I do not believe plaintiff has met his burden under Holley v.ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003), of proving a causal relation between his cervical disc herniation and his April 30, 2004, compensable injury by accident.
Dr. Garner made clear in his deposition testimony that the cause of a cervical disc herniation is rarely relevant to his treatment of the disc herniation, and that he generally does not care about the particular cause of injury for a particular patient:
 The mechanism for injury in a cervical disc herniation is really not very important to me. It's not nearly as important as the mechanism of an injury for a head injury or a broken neck or a — a broken back.
 I don't — it doesn't — it bears little or no significance to what I'm going to do to help that patient. So I don't really get into the details of how things happen. It's not because I'm lazy or not complete. It's just not important.
In fact, a cervical disc herniation can be the result of nearly any activity:
 Oh, gosh, you name it, it can happen. I've had people rupture discs rolling over in the bed to answer the phone. I've had people rupture a disc picking up the newspaper.
 I've had people in motor vehicle crashes in which they're thrown 150 feet that didn't rupture a disc. It's a fascinating spectrum of things.
Dr. Garner explained that, in the present action, his expert medical opinion that plaintiff's April 30, 2004, workplace fall was, "to a reasonable degree of medical certainty," a "likely cause" of *Page 11 
the herniated cervical disc for which Dr. Garner began treating plaintiff on March 7, 2005, was based exclusively on plaintiff's statements to Dr. Garner that plaintiff had had no trouble with his neck prior to his fall, and that plaintiff had consistently had neck trouble following his fall:
 Quite honestly, most of the time we don't know what causes a ruptured disc. It turns out that these contests that we're having today are — come down to what the temporal relationship was of the onset of pain.
 There's been one case in my career in which I can definitively say that a patient ruptured a disc in their neck in a motor vehicle crash. One case. Specific trauma, specific injury. And that was a lady that I operated on at Raleigh Community Hospital for a cervical disc. Took her cervical disc out.
 The next morning she got up, got in the car with her husband and promptly got hit on Wake Forrest Road right in front of the hospital.
 Turned right back around, went back into the emergency room and had an emergency MRI scan, and had a huge disc rupture at a different level than the one I had just operated on.
 Now, that patient, I testified, had a ruptured disc as a direct result of her motor vehicle crash. Other than that, I can't tell you.
 When [plaintiff's counsel] asked me my question of certainty, so forth and so on, whatever that was, that's based on the fact that this guy told me, "Doc, I didn't have any trouble with my neck before this, and I've had trouble with my neck since." So, it comes down to a temporal relationship with the onset of pain.
 So when you ask me, well, you know, couldn't he have done this some other way? Yes. Couldn't it have been there before he fell through the attic? Yes. Could he have done it after he fell through the attic? Yes.
 But the fact of the matter is, he comes to me — and unlike the law, you know, in medicine, we kind of assume they're telling us exactly the truth. You know, in law, you kind of have to be a little — a little more skittish, okay? But in medicine, we figure they're telling us exactly what happened. *Page 12 
 And when they come and tell me, yes, he did — [plaintiff] came and told me, you know, "I didn't have any trouble with my neck; I've had trouble since then," you know.
Thus, Dr. Garner's expert medical opinion causally linking plaintiff's workplace fall to his cervical disc herniation is based on (a) the fact that plaintiff's fall could have caused the disc herniation ultimately treated by Dr. Garner, and (b) Dr. Garner's understanding, based on what he was told by plaintiff, that plaintiff did not have symptoms of a cervical disc herniation prior to his workplace fall, and that the symptoms of the cervical disc herniation ultimately treated by Dr. Garner first appeared immediately following plaintiff's workplace fall.
However, the medical evidence of record demonstrates that plaintiff's statements to Dr. Garner concerning the history of his neck condition were not an accurate representation of plaintiff's actual medical history. Accordingly, I believe that Dr. Garner's expert medical opinion in the present action is not supported by the evidence of record, and is therefore insufficient to establish a causal relationship underHolley between plaintiff's workplace fall and his cervical disc herniation.
When Dr. Garner was asked in his deposition to describe the history he took from plaintiff prior to treating plaintiff's herniated cervical disc, Dr. Garner testified simply, "He told me that he fell through an attic, about a year before he came to see me." Dr. Garner did not relate any further history he had been given by plaintiff and, in fact, specifically testified that he had been told of no other possiblecauses of plaintiff's cervical disc herniation in the history he received from plaintiff. However, after reading Ms. Riddle's medical case management note on plaintiff's description of the February 19, 2005, "pop" in the left side of plaintiff's neck, which was followed immediately by cervical pain and by pain and tingling in plaintiff's left hand, Dr. Garner was asked: *Page 13 
 Q. From that scenario that is in that note, could that situation cause the herniation that you subsequently diagnosed?
 A. Yes. Absolutely.
 Q. Just for further clarification, would you say to a reasonable degree of medical certainty that the scenario that you just read into the record could have caused the disc herniation at C6-7 that you diagnosed [plaintiff] as having?
 A. Yes. Could have.
Because Dr. Garner clearly testified that the February 19, 2005, pop in plaintiff's neck was a possible cause of plaintiff's cervical disc herniation, it necessarily follows that the February 19, 2005, incident must not have been a part of the medical history Dr. Garner had previously received from plaintiff, and upon which Dr. Garner expressly based his expert medical opinion. To the extent that the majority has found that there is no evidence that Dr. Garner was unaware of the February 19, 2005, neck pop incident at the time he expressed his causation opinion, I believe the majority's finding to be inconsistent with Dr. Garner's actual deposition testimony.
Furthermore, the medical evidence of record is inconsistent with plaintiff's apparent report to Dr. Garner that he had experienced symptoms of a left-sided C6-7 cervical disc herniation ever since the time of his workplace fall. Dr. Garner testified that the typical symptoms of a herniated disc at C6-7 include neck, shoulder, and arm pain, with a predominance of shoulder and arm pain and not very much neck pain. Dr. Garner explained that the disc herniation itself does not cause much neck pain, but will instead cause numbness, tingling, pain, and weakness in the arm on the affected side. "The basic problem with a disc herniation is that the nerve that's trying to go out from the spinal cord to the shoulder and arm is pinched by a piece of disc right in the space where it's trying to go out. So anything that increases that pinching increases the pain" in the shoulder and arm, such as turning the head to one side, *Page 14 
coughing or sneezing, raising one's arms above the head, or otherwise doing anything strenuous. Finally, Dr. Garner testified that a C6-7 disc herniation is typically easy to diagnose, something "that a medical student — a good third-or fourth-year medical student should be able to diagnose without an MRI."
Plaintiff's medical records prior to February 19, 2005, however, include no reports of any left arm or shoulder pain. While the medical records do indicate sporadic complaints by plaintiff of numbness and tingling in his hands beginning as early as June 16, 2004, those complaints were consistently of bilateral numbness and tingling, and were not restricted to the left arm as would have resulted from the left-sided cervical disc herniation diagnosed and treated by Dr. Garner. Furthermore, the tingling and numbness reported by plaintiff was described as appearing with sleep, not with exertion or strain, as would have been expected had it been a symptom of a herniated cervical disc at C6-7.
The first mention of neck stiffness or discomfort in plaintiff's medical records prior to February 19, 2005, appears in Ms. Riddle's medical case management report of November 29, 2004, some seven months after plaintiff's workplace fall. That medical case management report described plaintiff's ongoing treatment for thoracic back pain, and mentioned additional complaints of lumbar back pain and some cervical discomfort and stiffness. Dr. Fulghum's notes shortly thereafter from his December 14, 2004, examination of plaintiff show that plaintiff's principal complaint at the time was of mid to low thoracic pain, but that "other areas of pain involving the neck, lower back, right leg and right foot . . . have been variously present, but he has continued to work." Dr. Fulghum diagnosed plaintiff with a thoracic muscular tear injury, and dismissed the remainder of plaintiff's non-thoracic pain symptoms, including his neck pain, as follows: "Some of his symptoms appear to be recruited simply because of this thoracic *Page 15 
imbalance and I do not believe the other symptoms are of physiologic importance." Dr. Fulghum's notes do not include any suggestion of a possible cervical disc herniation, despite Dr. Garner's testimony that such a condition, had it existed at the time, should have been easily diagnosed.
In significant contrast with plaintiff's prior medical symptoms, Ms. Riddle's medical case management note of February 21, 2005, provides:
 [Plaintiff] requests authorization for evaluation of cervical pain with onset since Saturday 2/19/05 when he was at home turned his head to speak to someone and experienced "a pop" in left side of his neck. He states he was not able to work as result of consistent pain and tingling in left hand.
Plaintiff was apparently unable to return to work at all after February 19, 2005, due to this onset of neck and left arm pain. Dr. Garner's notes regarding his first examination of plaintiff on March 7, 2005, describe "`locking' episodes in which [plaintiff] would have terrible pain and pain, numbness, and tingling down his left arm." For the first time since his April 30, 2004, workplace fall, plaintiff's medical symptoms rendered him unable to continue working, and he was written out of work by Dr. Garner from March 7, 2005, until his release from care on May 23, 2005.
The record of evidence in the present case therefore clearly indicates that plaintiff's symptoms of a left-sided cervical disc herniation at C6-7 did not appear immediately following plaintiff's April 30, 2004, workplace fall, but instead appeared only after the February 19, 2005, neck pop incident that plaintiff described to Ms. Riddle. Because Dr. Garner has acknowledged that the February 19, 2005, neck pop "absolutely" could have caused plaintiff's cervical disc herniation, and because the medical evidence of record is inconsistent with the sole remaining basis for Dr. Garner's expert medical opinion-that the symptoms of plaintiff's cervical disc *Page 16 
herniation first appeared immediately following the April 30, 2004, workplace fall — I believe that Dr. Garner's causation opinion in the present action is insufficient under Holley to provide the necessary foundation for the majority's relevant findings and conclusions of law.
Because I do not believe that plaintiff has met his burden of demonstrating that his cervical disc herniation resulted from his compensable workplace injury, I respectfully dissent from the majority's Opinion and Award.
This the __ day of June, 2007.
 S/____________________ BUCK LATTIMORE CHAIRMAN *Page 1